AO 93C (08/18) Warrant by Telephone or Other Reliable Electronic Means

☐ Original

CLERK'S OFFICE
A TRUE COPY
Dec 06, 2023
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No.  23-M-499 (SCD)
The person of Nakiya Wright (DOB: xx/xx/1994) )
and the residence located at 4003 S. 58th Street, )
Milwaukee, WI, described in Attachment A )

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:  Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____ *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B

**YOU ARE COMMANDED** to execute this warrant on or before ___12-20-23___ *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Hon. Stephen C. Dries___ .
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:  ___12-6-23. 12:15 pm___

*Judge's signature*

City and state:  Milwaukee, Wisconsin

U.S. Magistrate Judge Stephen C. Dries
*Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

<u>**ATTACHMENT A**</u>

*Person and Property to Be Searched*

1. The person of NAKIYA WRIGHT (B/F, DOB: XX/XX/1994)

2. The residence located at 4003 South 58th Street, Milwaukee, Wisconsin 53220 (the "Target Residence"), including the garage and any vehicles on the property. The Target Residence is further described as a single-story, red brick residence with dark blue/gray siding and white trim. It is the southwest corner lot at the intersection of West Norwich Avenue and South 58th Street. The numbers "4003" in black numbering on white background are affixed to the east side, adjacent to the east entry door. There are two entry doors to the residence, on the east and north sides. The associated detached garage with white siding is directly to the west of the residence and has a garage door that faces west into the north-south alley between South 58th and South 60th Streets, along with an entry door on the north side.



# ATTACHMENT B

## *Particular Things to be Seized*

1.     All records, information, and items related to violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 511 (altering or removing vehicle identification numbers), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. §§ 1956 and 1957 (money laundering and unlawful monetary transactions), and 18 U.S.C. §§ 2312 and 2313 (transportation of stolen vehicles and sale or receipt of stolen vehicles), occurring on or after January 2022, including:

   a. Documents, utility bills, and/or other documentary evidence establishing who is in control of the premises and vehicles on the premises;

   b. Bank statements and other documents related to financial accounts;

   c. Records, receipts, notes, and ledgers evincing the rental, theft, alteration, and sale of vehicles;

   d. Receipts relating to the purchase of financial instruments and tools of the trade used in the theft and resale of vehicles including GPS tracking devices and key re-programmers;

   e. Vehicle identification records or part numbers, vehicle title or registration paperwork, key fobs;

   f. Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

   g. Cellular phones, computers, and electronics capable of communication or storage;

   h. U.S. currency and other assets obtained as proceeds of the crimes described herein.

   i. For computers, cellphones, and electronics capable of communication or storage (collectively, "computers"):

      i. location information associated with the co-conspirators, call and message records associated with the co-conspirators, photographs and videos of stolen vehicles, communications about stolen vehicles, records related to GPS tracking devices, records related to VINs and titles, records related to the transportation of vehicles, records related to money transfers, records related to the advertisement of vehicles, records related to vehicle storage, records related to the purchase of tools for use in the scheme, and records related to other preparatory steps taken in furtherance of the scheme;

      ii. photographs, videos, communications, and other records related to bank accounts and money transfer accounts owned or utilized by subjects of this investigation in relation to the crimes under investigation;

2

iii. evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

iv. evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

v. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

vi. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

vii. evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

viii. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

ix. evidence of the times the computer was used;

x. passwords, encryption keys, and other access devices that may be necessary to access the computer;

xi. documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

xii. records of or information about Internet Protocol addresses used by the computer;

xiii. records of or information about the computer's internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

xiv. contextual information necessary to understand the evidence described in this attachment;

xv. lists of contacts and any identifying information.

3

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of NAKIYA WRIGHT to the fingerprint scanner of the device; (2) hold a device found in front of the face of NAKIYA WRIGHT and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

4

CLERK'S OFFICE
A TRUE COPY
Dec 06, 2023
s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )
                                   )     Case No. 23-M-499 (SCD)
The person of Nakiya Wright (DOB: xx/xx/1994) and )
the residence located at 4003 S. 58th Street, )
Milwaukee, WI, described in Attachment A )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

    I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B

    The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

    The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 USC §§ 371, 511,1343, 1956, 1957, 2312, 2313 | Conspiracy, Altering VINs, Wire Fraud, Money Laundering, Interstate Transportation of Stolen Vehicles, Sale/Receipt of Stolen Vehicles |

    The application is based on these facts:

See Affidavit

☐ Continued on the attached sheet.

☐ Delayed notice of \_\_\_\_\_ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

FBI SA Shane Hoffmann
_____
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____telephone_____ *(specify reliable electronic means)*.

Date: 12-6-23                   _____
*Judge's signature*

City and state: Milwaukee, Wisconsin       U.S. Magistrate Judge Stephen C. Dries
_____
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF
## AN APPLICATION FOR A SEARCH WARRANT

I, Shane Hoffmann, being first duly sworn, hereby depose and state a follows:

### INTRODUCTION AND AGENT BACKGROUND

1.  I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property, a residential dwelling, and a person, and the extraction of evidence from those locations as described in Attachment B.

2.  I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since September 2015. I am currently assigned to the Milwaukee Division – Madison Resident Agency. Since becoming a Special Agent, I have received specialized training in conducting criminal investigations, and my responsibilities include conducting investigations of alleged criminal violations of federal statutes and laws. I have participated in the execution of search warrants in various judicial districts, including the recovery of records, contraband, and other types of property. I have received training in computer technology, and I have on numerous occasions reviewed the content of targets' phones and computers, email accounts, and social media accounts for evidence of criminal activity.

3.  This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### LOCATIONS TO BE SEARCHED

4.  The person of Nakiya WRIGHT (DOB: 01/09/1994); and

5.  The residence of Nakiya WRIGHT, located at 4003 S. 58th Street, Milwaukee, Wisconsin (the "Target Residence"), including the garage and any vehicles on the property.

## PROBABLE CAUSE

6. The United States, including the Federal Bureau of Investigation, Internal Revenue Service, along with state and local law enforcement partners, is conducting a criminal investigation of DIAUNTE D. SHIELDS (DOB: 02/18/1995) and others known and unknown, regarding possible violations of, among other crimes, 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 511 (altering or removing vehicle identification numbers), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. §§ 1956 and 1957 (money laundering and unlawful monetary transactions), and 18 U.S.C. §§ 2312 and 2313 (transportation of stolen vehicles and sale or receipt of stolen vehicles).

7. The hubs of SHIELDS's criminal enterprise include Milwaukee, Wisconsin, Chicago, Illinois, and Atlanta, Georgia. This investigation involves, among other crimes, the organized theft and resale of high-end motor vehicles, including Dodge Ram TRXs, Dodge Challenger Hellcats, Cadillac Escalades, Chevrolet Corvettes, Jeep Trackhawks, Jeep SRTs, GMC Yukons, Chevy Suburbans, and others. I know from my training and experience that there is a large amount of money associated with the theft and sale of high-end motor vehicles. The enterprise acquires the vehicles from a variety of sources, including stealing them from private properties, public parking lots including airports, rental car facilities, dealerships, and assembly plants. The vehicles are often stolen utilizing key reprogramming technology. Investigators have also learned that participants utilize GPS tracking technology to track vehicles targeted for theft. To date, investigators have linked hundreds of stolen vehicles to the group with a value exceeding $10 million dollars. Although the vehicles are often sold well below market value, the actors profit significantly from the resale of vehicles.

8. Law enforcement has identified SHIELDS as a leader of the organization with known criminal activities dating back to at least 2019 and continuing through his arrest in Chicago,

2

Illinois on November 29, 2023. A number of additional actors have been identified. These actors play a variety of roles in the enterprise enabling the facilitation of the group's activities.

9. Among the actors is Nakiya WRIGHT (DOB: 01/09/1994), an identified girlfriend of SHIELDS. Available phone records indicate that WRIGHT (utilizing phone numbers 414-520-7366 and 414-801-0386, subscribed in her mother's name) has consistently been a frequent contact of SHIELDS since early 2022 through November 2023.

10. In addition to the other criminal activity described below, WRIGHT has also shared in the spoils of the vehicle theft trade. For example, in September 2022, she possessed, and registered in the name of her company called "A Mother's Love the Wright Way LLC" (a Wisconsin company), a 2018 burgundy Jeep with VIN 1C4RJFN94JC281718 that appears to have been stolen. WRIGHT presented her Wisconsin driver's license during the registration. Per an affidavit provided by the National Insurance Crime Bureau ("NICB"), VIN 1C4RJFN94JC281718 was never assigned to a 2018 Jeep; this is an indicator of fraud and theft, consistent with the true VIN of a stolen vehicle having been replaced with a false VIN. Additionally, WRIGHT presented a Georgia title during registration that included the referenced (false) VIN and represented that the purported owner was "A Mother's Love the Wright Way LLC" with an address of 5439 Westchase Drive, Marietta, Georgia. Based on the certificate number on the title, investigators were able to conclude that the title had been stolen from the Georgia Department of Revenue.

11. WRIGHT has provided a significant amount of assistance to SHIELDS as outlined below, including, among other things, (1) providing physical storage locations for SHIELDS and his associates to store vehicles and alter them for theft and resale, and (2) helping SHIELDS to launder proceeds through her accounts.

**Physical Storage for Stolen Vehicles and Tools of the Trade**

*Background: Shorewood Apartment*

12.     In 2022, investigators first learned that WRIGHT was renting an apartment at 4041 N. Oakland Avenue, Unit 413, Shorewood, Wisconsin.  Investigators determined that WRIGHT was allowing SHIELDS to utilize the underground parking at the location to store stolen vehicles as exemplified below.

13.     On January 2, 2023, at approximately 6:19 a.m., Milwaukee County Sheriff's Office ("MCSO") Detectives Mason Kohlhapp and Matthew Vandertie arrived at the LightHorse 4041 Apartments, located at 4041 North Oakland Avenue, Shorewood, Wisconsin and entered the lower-level parking structure. Detectives Kohlhapp and Vandertie observed a white 2023 Jeep Grand Cherokee Overland bearing Georgia temporary license plate S1400575 displayed on the rear, VIN 1C4RJGDGXP8541847 associated with the Georgia temporary license plate, and VIN 1C4RJHDG6PC508914 on the dashboard.  The two VINs did not match. The Georgia temporary tag was effective as of December 26, 2022, and was registered to Keith Lawson with no listed address. The white 2023 Jeep Grand Cherokee Overland bearing Georgia temporary license plate S1400575 was parked in a handicap parking space with damage to the passenger's side, including body damage, a broken side mirror, and a flat rear passenger's tire.

14.     Detective Vandertie conducted records checks of dashboard VIN 1C4RJHDG6PC508914 through Georgia and Wisconsin and noted that there were no results returned. National Insurance Crime Bureau ("NICB") Agent Todd Heinz informed Detective Vandertie that there were shipping records on file for VIN 1C4RJHDG6PC508914. However, the vehicle associated with VIN 1C4RJHDG6PC508914 had not yet been shipped to a dealership, according to the shipping records. According to Special Agent Heinz, the VIN

4

1C4RJGDGXP8541847 associated with the Georgia temporary license plate did not return a response. VIN 1C4RJGDGXP8541847 was decoded to a two-wheel drive Grand Cherokee and not a four-wheel drive Grand Cherokee like the windshield VIN.

15.     A representative from Stellantis, the parent company for Jeep, informed Detective Vandertie that the white 2023 Jeep Grand Cherokee Overland bearing VIN 1C4RJHDG6PC508914 was scheduled for shipment to Charlotte, North Carolina. Detective Vandertie was informed by Stellantis Investigations that the white 2023 Jeep Grand Cherokee Overland bearing VIN 1C4RJHDG6PC508914 was reported stolen to the Detroit Police Department on January 4, 2022.

16.     On January 3, 2023, and January 4, 2023, investigators observed the white 2023 Jeep Grand Cherokee Overland bearing VIN 1C4RJHDG6PC508914 in the lower-level parking structure of the LightHorse 4041 Apartments, located at 4041 North Oakland Avenue, Shorewood, Wisconsin.

17.     On March 8, 2023, investigators seized the white 2023 Jeep Grand Cherokee Overland as it was parked in the 1600 block of S. 9th Street, Milwaukee, Wisconsin.  On March 9, 2023, the Honorable Barry Phillips, Judicial Court Commissioner, authorized a search warrant for the vehicle.  Execution of the search warrant revealed that the white 2023 Jeep Grand Cherokee Overland had genuine VIN 1C4RJHDG6PC508914, and was the same vehicle previously observed by investigators in January 2023 that was stolen from Detroit, Michigan.  Temporary state of Georgia operating permit S1400575 was recovered from the glove box.

<em>Target Residence</em>

18.     In November 2022, investigators learned that WRIGHT moved to **4003 S. 58th Street, Milwaukee, Wisconsin (the "Target Residence")**.  Lease information showed that Nakita

5

Williams, WRIGHT's mother, secured a lease at the **Target Residence** from November 25, 2022, through March 31, 2024. Despite being in the name of Nakita Williams, investigators have seen WRIGHT utilize the residence, and have also seen SHIELDS at the residence. For example:

a. On December 30, 2022, investigators saw SHIELDS exit the **Target Residence** and depart in a silver Chevrolet Impala with Wisconsin license plate ARF9505. The vehicle was known to be used by SHIELDS and associates. Minutes later, investigators observed WRIGHT exit the residence and depart the garage in a silver Lexus that was registered in her name.

b. On January 31, 2023, investigators observed a Chevrolet Impala with Michigan Dealer plate parked in the garage of the **Target Residence.** The license plate and the vehicle have been connected to SHIELDS and associates and was being electronically tracked at one point during the investigation.

c. On April 17, 2023, investigators observed a black BMW with Wisconsin license plate ANX9568 parked in front of the **Target Residence**. The plate was registered to DAW Logistics, a business entity associated with SHIELDS. At approximately 3:25 pm, WRIGHT exited the **Target Residence**, entered the BMW and departed.

d. On December 5, 2023, at approximately 7:25 am, investigators observed a black female, whose appearance was consistent with WRIGHT's physical description, leave the **Target Residence** with three children and depart in a minivan registered to an LLC in WRIGHT's name. Investigators are aware that WRIGHT has three children.

*Turo Rental Thefts*

19. Investigators have recently discovered that SHIELDS and his associates, including WRIGHT, have expanded their criminal business to include the theft and resale of vehicles that they identify on Turo, a car-sharing marketplace where car owners can rent their vehicles to others.

20. The FBI and local partners have been investigating a series of Chevrolet Corvette and Cadillac Escalade thefts involving Turo vehicle rentals. All of the thefts share similar characteristics, including that a Corvette or an Escalade is rented from Turo for a couple of days, returned, and then stolen in the days following the return. Investigators have determined that during the initial rental period, SHIELDS and associates affix a GPS tracker to the vehicle and program a key for the vehicle. This allows the perpetrators to track the vehicle once returned and find an opportune time to steal the vehicle with the reprogrammed key. To date, investigators have linked the thefts of at least nine high-end Turo rental vehicles to SHIELDS, occurring from February 2023 through November 2023. The thefts have occurred in Wisconsin, Illinois, and Georgia.

21. Based on information from a GPS tracking device recovered from one vehicle that was targeted for theft, investigators believe that SHIELDS is using the **Target Residence** as his temporary storage and "chop" shop, where he affixes a tracking device to the car in preparation for ultimate theft.

22. To illustrate, on November 8, 2023, a 2023 Cadillac Escalade was stolen from a residence in Carol Stream, Illinois. The suspected chase vehicle utilized in the theft (*i.e.*, a car occupied by more than one person, such that one person can exit the chase vehicle to steal and drive away another vehicle) was a gray Dodge Charger Scat Pack, Illinois license plate DJ88796, which was registered to DEAMONTE LEE, an associate of SHIELDS, and was also utilized in a

7

number of other Turo vehicle thefts. Investigators also observed the gray Dodge Charger Scat Pack in the parking garage of 4747 19th Street, Chicago, Illinois, which was where SHIELDS was staying with his other girlfriend, CASHA GRIFFIN, and where both were ultimately arrested on November 29, 2023.

23.  Turo records indicate that JAZMA SMITH rented the 2023 Cadillac Escalade from October 29, 2023, through October 31, 2023. Investigators believe that SMITH is the mother of JALEAN LITTLE, a known associate of SHIELDS.

24.  Upon the return of the 2023 Cadillac Escalade, the owner inspected the vehicle and found a barcode that had been left behind in the rear passenger area that read, "Optimus GB100M 4G LTE…Car's Battery GPS Tracker." The owner then checked the vehicle's battery and found a black tracking device identified by IMEI 867204060103249. The owner had no knowledge of a tracking device being present on his vehicle prior to the October 29-31, 2023 rental. Despite the owner discovering and removing the tracking device, this vehicle was later stolen from the owner's residence.

25.  Optimus GPS Tracking ("Optimus") provided GPS coordinates for the device identified by IMEI 867204060103249, which was activated on October 30, 2023, at approximately 3:58 pm. The first location registered on the device was 42.971896, -87.987262 which resolves to the area of **4003 S. 58th Street, Milwaukee, Wisconsin,** the **Target Residence**. Phone records for 224-315-2464, a number known to be used by SHIELDS, indicated that the phone with that number used a tower that provides coverage in the area of the **Target Residence** from approximately 1:05 pm to 4:24 pm on October 30, 2023, before returning to Illinois later in the evening. Based on my training, experience, and knowledge of the case, I believe that SHIELDS affixed the GPS device to the 2023 Cadillac Escalade at the **Target Residence**.

8

26. Optimus confirmed the existence of an account in the name NAKIYA WRGHT with an associated email devon.jackson5@icloud.com and phone number 740-789-0119. The investigation has linked both the email and the phone number to DIAUNTE SHIELDS. Including the tracker with IMEI 867204060103249, the account had nine GPS devices associated with it, all with activation dates in 2023.

27. Additionally, on November 1, 2023, Wheaton Police Department, Illinois, received a report of a blue 2022 Chevrolet Corvette bearing IL registration BT84580 stolen from a church parking lot in Wheaton, Illinois, between the hours of 6:30 pm and 7:30 pm. The owner of the vehicle was still in possession of the key. The investigation revealed that the vehicle was previously rented on Turo to Alexus Caldwell, a frequent phone contact of WRIGHT, from October 17, 2023, to October 19, 2023. Records indicated that Caldwell had previously rented three additional vehicles on Turo (two Corvettes and one Escalade) that were stolen in the weeks following their return. Those vehicles were stolen in April, May, and August of 2023.

28. On November 1, 2023, records for phone number 224-315-2464, a number known to be utilized by SHIELDS, showed that the target phone used a tower in Wheaton, Illinois, at approximately 7:17 pm. At approximately 10:17 pm and 10:29 pm the target phone used a tower that provides coverage in the area of the **Target Residence**. The phone then has records consistent with travel back towards Chicago after 1:00 am on November 2, 2023. Based on my training, experience, and knowledge of the case, I believe that SHIELDS traveled to the **Target Residence** after stealing the blue Corvette in Wheaton, Illinois.

29. Messages located in the iCloud account associated with WRIGHT further indicate that SHIELDS used WRIGHT to have tools of his trade, including GPS tracking devices, delivered to her residence, for his use. For example:

9

a. On March 16, 2023, WRIGHT texted SHIELDS, "We can meet by my house tomorrow at 8:30 so you can get the van. I'll leave the key in the cup holder. And when the trackers come I'll take them to smiley." [Smiley is a known nickname for LaShawn DAVIS, an associate of SHIELDS.]

b. On March 20, 2023, WRIGHT texted SHIELDS, "Your cords came," to which SHIELDS responded, "Which one," and WRIGHT replied, "From eBay."

30.     The Turo rentals previously described (*i.e.*, the October 17-19 rental of the Chevrolet Corvette and the October 29-31 rental of the Cadillac Escalade) were two of nine known Turo thefts linked to SHIELDS. Of the nine, NAKIYA WRIGHT rented four of the vehicles prior to them being stolen, as outlined below.

a. A review of text messages from WRIGHT's iCloud account (nakwright94@icloud.com) showed that on or around February 7, 2023, SHIELDS, utilizing phone number 773-441-8282, sent WRIGHT the Turo link for a white 2022 Chevrolet Corvette Stingray Convertible. SHIELDS asked WRIGHT if she was still trying to grab the rental to which WRIGHT replied, "Why wouldn't I?" From February 8, 2023, to February 11, 2023, WRIGHT rented a white 2022 Chevrolet Corvette Stingray Convertible 2LT, VIN 1G1YB3D45N5124151, in Atlanta, Georgia. WRIGHT's iCloud messages indicated that SHIELDS and WRIGHT were in Atlanta together. On or about February 12, 2023, WRIGHT texted SHIELDS, "…I came down there and did everything you asked me to do…I was down there to get the car and once that was done and I left you was done with me." On February 18, 2023, seven days after the end of the rental period, the vehicle was reported stolen to the Cobb County Police Department, case # 23-

10

013465. The vehicle was recovered on August 23, 2023, by the Rutherford County Sheriff's Office, Murfreesboro, Tennessee.

b. A review of text messages from WRIGHT's iCloud account (nakwright94@icloud.com) showed that on or around March 25, 2023, SHIELDS, utilizing phone number 773-318-4593, sent WRIGHT the Turo link for a black 2021 Cadillac Escalade in Arlington Heights, Illinois. Their conversation also indicated that on March 25, 2023, WRIGHT met SHIELDS in Chicago. From March 26, 2023, to March 28, 2023, WRIGHT rented a black 2021 Cadillac Escalade, VIN 1GYS4AKL7MR295510, in Arlington Heights, Illinois. On June 6, 2023, the vehicle was reported stolen to the Chicago Police Department, case JG290194. The vehicle has not been recovered.

c. From July 22, 2023, to July 23, 2023, WRIGHT rented a red 2021 Chevrolet Corvette Stingray Convertible 2LT, VIN 1G1YB3D43M5121943 in Detroit, Michigan. Three days later, on July 26, 2023, the vehicle was reported stolen to the Detroit Police Department, case #230726-0182. The vehicle has not been recovered.

d. From October 16, 2023, to October 18, 2023, WRIGHT rented a white 2022 Cadillac Escalade, VIN 1GYS4CKL0NR120514, in West Chicago, Illinois. Surveillance video confirmed that upon return on October 18, 2023, the driver of the white 2022 Cadillac Escalade was picked up by a Chrysler Town and Country minivan with Wisconsin license plate ATB6510. The minivan was registered to Wright Way Transportation LLC, Milwaukee, Wisconsin, with a registered agent of NAKIYA WRIGHT. On November 9, 2023, the vehicle was reported stolen to

11

the West Chicago Police Department, case #WCPC2302036. The vehicle has not been recovered.

**WRIGHT's Laundering of SHIELDS's Proceeds**

31. The investigation has also shown that SHIELDS relied on WRIGHT to assist in laundering his proceeds, including by giving him access to her financial accounts and paying his associates. In return for her assistance, WRIGHT benefited financially from SHIELD's illegal proceeds.

32. From June 2022 through March 2023, Cash App records show that WRIGHT sent more than $18,000 to known associates of SHIELDS. From August 2022 through February 2022, WRIGHT received more than $8,000 sent to her from Cash App accounts associated with SHIELDS. For example:

    a. Messages from nakwright94@icloud.com, an iCloud account linked to WRIGHT, showed that on or about August 19, 2022, SHIELDS, utilizing phone number 773-560-8254, sent WRIGHT, "Send 1700 to huncho for me love I put it in the acc already." Cash App records indicated that on or about August 19, 2022, WRIGHT transferred $1,700 to Rich Visionz Custom Auto. "Huncho" has been identified as Brandon MULLINS, a Georgia based subject who makes fraudulent titles for SHIELDS.

    b. Messages from nakwright94@icloud.com showed that on or about February 24, 2023, SHIELDS, utilizing phone number 773-668-3749, sent WRIGHT, "You got 350 on cash app?" WRIGHT indicated that she did not, but stated that she could add it. She then asked SHIELDS who she should send it to and SHIELDS stated, "You got the rich visions one?" Cash App records indicated that on or about

12

February 24, 2023, WRIGHT transferred $350 to Rich Visionz Custom Auto (MULLINS.)

33. On November 9, 2022, investigators observed SHIELDS go to an ATM at the Self Help Credit Union located at 3340 S. 27th Street, Milwaukee, Wisconsin. Video and bank records showed SHIELDS depositing more than $6,000 cash into a Navy Federal Credit Union personal account owned by NAKIYA WRIGHT. Further analysis of NAKIYA WRIGHT'S Navy Federal Credit Union account showed $26,535.95 in ATM deposits occurring at the same Self Help Federal Credit Union between July 11, 2022, and December 29, 2022.

34. A photo from jeff071293@icloud.com, an account that investigators have associated with SHIELDS, with a capture date of November 30, 2022, showed a hand from a black individual holding a Walmart to Walmart wire transfer receipt with reference number 654803496. The receipt was for $2,500 that was wired to Wisconsin and available for pickup on November 30, 2022. The name "NAKIA SHARIA WRIGHT" was listed on the receipt.

35. On February 1, 2023, WRIGHT opened a business bank account for Wright Way Transportation LLC at Navy Federal Credit Union. Bank records show the physical location for the business to be 3489 N. 76th Street, Suite 202, Milwaukee, Wisconsin. Wisconsin Department of Financial Institutions records show that the business was registered on January 13, 2023, with WRIGHT being the registered agent. Despite the business being purportedly in Milwaukee, Wisconsin, almost all the banking activity in the business account occurred in the Atlanta, Georgia, area. Between February 8, 2023, and February 28, 2023, $3,780 in ATM deposits occurred, all of which were in the Atlanta, Georgia, area. Investigators know that SHIELDS frequents the Atlanta, Georgia, area. Investigators believe SHIELDS to be using the Wright Way Transportation LLC

13

business account and WRIGHT'S personal account to make cash deposits related to criminal activity.

## COMPUTERS, CELLPHONES, ELECTRONIC STORAGE, FORENSIC ANALYSIS

36.     Based on my training, experience, and the information gathered throughout the course of this investigation, I know that individuals engaged in criminal activity, including financial crimes, often maintain several sets of books and records of their legal and illegal activities. These records include journals, ledgers, notebooks, financial records, and other records identifying the source and disposition of funds. Individuals maintain these records on hardcopy and electronic format, to include computers, compact disks, flash drives, remote servers, hard drives, smart phones, and other data storage devices and services. These records are typically maintained by the individuals for extended periods of time and stored in secured locations within their residences, businesses, personal vehicles, safes, safe deposit boxes, storage facilities, and on their person. Therefore, I believe that WRIGHT maintains records related to the vehicle theft and money laundering scheme at her residence and on her personal electronic devices, where I believe she conducts some of her business.

37.     As described above and in Attachment B, this application seeks permission to search for evidence that might be found at Wright's residence and/or on WRIGHT's person, in whatever form is it found. One form in which the evidence might be found is data stored on a computer's hard drive, cellphone, or other storage media. Thus, the warrant for which I am applying would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

14

38. *Probable cause*. I submit that if a computer, cellphone, or storage medium is found at the **Target Residence** and/or on WRIGHT's person, there is probable cause to believe those records will be stored on that computer or storage medium, for at least the following reasons:

a. Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being used by an active file—for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it. To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. Computer users typically do not erase or delete this evidence, because special software is typically required for that task. However, it is technically possible to delete this information.

d. Similarly, files that have been viewed via the internet are sometimes automatically downloaded into a temporary internet directory or "cache."

39. *Forensic evidence*. As further described in Attachment B, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also forensic electronic evidence that establishes how computers were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence will be on any storage medium in the **Target Residence** and/or on WRIGHT's person, because:

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that

15

show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b. As explained herein, information stored within a computer and other electronic storage media may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or, alternatively, to exclude the innocent from further suspicion. In my training and experience, information stored within a computer or storage medium (e.g., registry information, communications, images and movies, transactional information, records of session times and durations, internet history, and anti- virus, spyware, and malware detection programs) can indicate who has used or controlled the computer or storage medium. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. The existence or absence of anti-virus, spyware, and malware detection programs may indicate whether the computer was remotely accessed, thus inculpating or exculpating the computer owner. Further, computer and storage media activity can indicate how and when the computer or storage medium was accessed or used. For example, as described herein, computers typically contain information that log: computer user account session times and durations, computer activity associated with user accounts, electronic storage media that connected with the computer, and the IP addresses through which the computer accessed networks and the internet. Such information allows investigators to understand the chronological context of computer or electronic storage media access, use, and events relating to the crime under investigation. Additionally, some information stored within a computer or electronic storage media may provide crucial evidence relating to the physical location of other evidence and the suspect. For example, images stored on a computer may both show a particular location and have geolocation information incorporated into its file data. Such file data typically also contains information indicating when the file or image was created. The existence of such image files, along with external device connection logs, may also indicate the presence of additional electronic storage media (e.g., a digital camera or cellular phone with an incorporated camera). The geographic and timeline information described herein may either inculpate or exculpate the computer user. Last, information stored within a computer may provide relevant insight into the computer user's state of mind as it relates to the offense under investigation. For example, information within the computer may indicate the owner's motive and intent to commit a crime (e.g., internet searches indicating criminal planning), or consciousness of guilt (e.g., running a "wiping" program to destroy evidence on

16

the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement)

c. A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium. For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

40. *Necessity of seizing or copying entire computers or storage media.* In most cases, a thorough search of a warrant location for information that might be stored on storage media often requires the seizure of the physical storage media and later off-site review consistent with the warrant. In lieu of removing storage media from the warrant location, it is sometimes possible to make an image copy of storage media. Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all hidden sectors and deleted files. Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction. This is true because of the following:

a. The time required for an examination. As noted above, not all evidence takes the form of documents and files that can be easily viewed on site. Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time at the site of the warrant could be unreasonable. As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence. Storage media can store a large volume of information. Reviewing that information for things

17

described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b. Technical requirements. Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations. Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site. The vast array of computer hardware and software available makes it difficult to know before a search what tools or knowledge will be required to analyze the system and its data at the warrant location. However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

c. Variety of forms of electronic media. Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

41.     *Nature of examination.*   Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant for which I am applying would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant. The later review may require techniques including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

42.     Because multiple people may share the **Target Residence**, it is possible that the property will contain storage media that are predominantly used, and perhaps owned, by persons who are not suspected of a crime.  If it is nonetheless determined that it is possible that the things described in this warrant could be found on any of those computers or storage media, the warrant applied for would permit the seizure and review of those items as well.

### BIOMETIC UNLOCK

43.     The warrant I am applying for would permit law enforcement to obtain from WRIGHT the display of physical biometric characteristics (such as fingerprint, thumbprint,

18

or facial characteristics) to unlock devices subject to search and seizure pursuant to this warrant. I seek this authority based on the following:

44. I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device through biometric features in lieu of a numeric or alphanumeric passcode or password. These biometric features include fingerprint scanners and facial recognition features. Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

45. If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints. For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device. Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device. The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

46. If a device is equipped with a facial recognition feature, a user may enable the ability to unlock the device through his or her face. For example, Apple offers a facial recognition feature called "Face ID." During the Face ID registration process, the user holds the device in front of his or her face. The device's camera then analyzes, and records data based on the user's facial characteristics. The device can then be unlocked if the camera detects a face with characteristics that match those of the registered face. Facial recognition features found on devices produced by other manufacturers have different names but operate similarly to Face ID.

19

47. In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

48. As discussed in this affidavit, based on my training and experience, I believe that one or more digital devices will be found during the search. The passcode or password that would unlock the device(s) subject to search under this warrant is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

49. I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when (1) more than 48 hours has elapsed since the device was last unlocked or (2) when the device has not been unlocked using a fingerprint for 4 hours and the passcode or password has not been entered in the last 156 hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

20

50.     Due to the foregoing, if law enforcement personnel encounter a device that is subject to search and seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, the warrant I am applying for would permit law enforcement personnel to (1) press or swipe the fingers (including thumbs) of NAKIYA WRIGHT to the fingerprint scanner of the device; (2) hold the device in front of the face of NAKIYA WRIGHT and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search its contents as authorized by this warrant.

### CONCLUSION

51.     On November 29, 2023, law enforcement arrested SHIELDS and CASHA GRIFFIN at 4747 19th Street, unit 503, Chicago, Illinois.  SHIELDS had three state warrants from Wisconsin, Illinois, and Missouri, and GRIFFIN was arrested on bail jumping warrants from Kenosha County, Wisconsin.  State search warrants were also executed at their residence and three storage units linked to SHIELDS.  Numerous items related to vehicle theft and VIN alteration were recovered in addition to suspected narcotics and a firearm.

52.     NAKIYA WRIGHT has been a girlfriend of SHIELDS since the investigation first identified her in 2022.  As explained above, WRIGHT has shown a long history of assisting SHIELDS in his criminal activities by supplying physical locations to store vehicles, setting up fraudulent LLCs, providing payments to associates, and allowing him access to her financial accounts.  Recently, SHIELDS utilized WRIGHT to set up and pay for an Optimus tracking subscription which he utilized to steal high end vehicles.  He also utilized her residence, the **Target Residence**, as a safe place to affix a GPS unit to a targeted car and likely store other stolen vehicles and tools of his trade.

21

53.     I respectfully request a search warrant to be authorized for the search of the **Target Residence** and WRIGHT's person, described in Attachment A, to recover and seize evidence described in Attachment B, in any form, including on any cellular phone or electronic device.

22

# ATTACHMENT A

## *Person and Property to Be Searched*

1. The person of NAKIYA WRIGHT (B/F, DOB: XX/XX/1994)

2. The residence located at 4003 South 58th Street, Milwaukee, Wisconsin 53220 (the "Target Residence"), including the garage and any vehicles on the property. The Target Residence is further described as a single-story, red brick residence with dark blue/gray siding and white trim. It is the southwest corner lot at the intersection of West Norwich Avenue and South 58th Street. The numbers "4003" in black numbering on white background are affixed to the east side, adjacent to the east entry door. There are two entry doors to the residence, on the east and north sides. The associated detached garage with white siding is directly to the west of the residence and has a garage door that faces west into the north-south alley between South 58th and South 60th Streets, along with an entry door on the north side.



*Particular Things to be Seized*

1.	All records, information, and items related to violations of 18 U.S.C. § 371 (conspiracy), 18 U.S.C. § 511 (altering or removing vehicle identification numbers), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. §§ 1956 and 1957 (money laundering and unlawful monetary transactions), and 18 U.S.C. §§ 2312 and 2313 (transportation of stolen vehicles and sale or receipt of stolen vehicles), occurring on or after January 2022, including:

a.	Documents, utility bills, and/or other documentary evidence establishing who is in control of the premises and vehicles on the premises;

b.	Bank statements and other documents related to financial accounts;

c.	Records, receipts, notes, and ledgers evincing the rental, theft, alteration, and sale of vehicles;

d.	Receipts relating to the purchase of financial instruments and tools of the trade used in the theft and resale of vehicles including GPS tracking devices and key re-programmers;

e.	Vehicle identification records or part numbers, vehicle title or registration paperwork, key fobs;

f.	Safes, vaults, or lock boxes used to store proceeds or records from these crimes;

g.	Cellular phones, computers, and electronics capable of communication or storage;

h.	U.S. currency and other assets obtained as proceeds of the crimes described herein.

i.	For computers, cellphones, and electronics capable of communication or storage (collectively, "computers"):

  i.	location information associated with the co-conspirators, call and message records associated with the co-conspirators, photographs and videos of stolen vehicles, communications about stolen vehicles, records related to GPS tracking devices, records related to VINs and titles, records related to the transportation of vehicles, records related to money transfers, records related to the advertisement of vehicles, records related to vehicle storage, records related to the purchase of tools for use in the scheme, and records related to other preparatory steps taken in furtherance of the scheme;

  ii.	photographs, videos, communications, and other records related to bank accounts and money transfer accounts owned or utilized by subjects of this investigation in relation to the crimes under investigation;

2

iii. evidence indicating how and when the account was accessed or used, to determine the geographic and chronological context of account access, use, and events relating to the crimes under investigation and to the account owner;

iv. evidence indicating the computer user's state of mind as it relates to the crimes under investigation;

v. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

vi. evidence indicating how and when the computer was accessed or used to determine the chronological context of computer access, use, and events relating to crime under investigation and to the computer user;

vii. evidence of the attachment to the computer of other storage devices or similar containers for electronic evidence;

viii. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the computer;

ix. evidence of the times the computer was used;

x. passwords, encryption keys, and other access devices that may be necessary to access the computer;

xi. documentation and manuals that may be necessary to access the computer or to conduct a forensic examination of the computer;

xii. records of or information about Internet Protocol addresses used by the computer;

xiii. records of or information about the computer's internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any internet search engine, and records of user-typed web addresses;

xiv. contextual information necessary to understand the evidence described in this attachment;

xv. lists of contacts and any identifying information.

3

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage and any photographic form.

The term "computer" includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, notebook computers, mobile phones, tablets, server computers, and network hardware.

The term "storage medium" includes any physical object upon which computer data can be recorded. Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

During the execution of the search described in Attachment A, law enforcement personnel are authorized to (1) press or swipe the fingers (including thumbs) of NAKIYA WRIGHT to the fingerprint scanner of the device; (2) hold a device found in front of the face of NAKIYA WRIGHT and activate the facial recognition feature, for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

4